AO 102 (01/09)  Application for a Tracking Warrant   (modified by USAO for telephone or other reliable electronic means)

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

10/30/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person to be tracked or describe*<br>*the object or property to be used for tracking)*<br>A UNITED STATES POSTAL SERVICE PRIORITY MAIL PACKAGE WITH TRACKING NUMBER 9505 5100 5288 3298 8004 59 | ) ) ) ) ) )  Case No.   3:23-mj-469 |

**APPLICATION FOR A TRACKING WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of __21__ U.S.C. § __841 & 846 and 843__. Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☑ property designed for use, intended for use, or used in committing a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ a person to be arrested or a person who is unlawfully restrained.

☐ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Sean C. Humphrey*
Applicant's signature

Sean C. Humphrey, USPIS Task Force Officer
Applicant's printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ Telephone _ *(specify reliable electronic means)*.

Date: 10/30/23

City and state: Dayton, OH

Peter B. Silvain, Jr.
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF A UNITED STATES POSTAL SERVICE PRIORITY MAIL PACKAGE BEARING TRACKING NUMBER 9505 5100 5288 3298 8004 59 | Case No. 3:23-mj-469<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Sean C. Humphrey, being first duly sworn, do hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in a United States Postal Service Priority Mail Package bearing Tracking Number 9505 5100 5288 3298 8004 59 ("the SUBJECT PACKAGE"). Based on the facts set forth in this affidavit, I believe that the SUBJECT PACKAGE is presently being used in furtherance of drug trafficking and conspiracy to commit drug trafficking, in violation of Title 21 U.S.C. §§ 841 and 846, and use of a communication facility to commit a felony, in violation of Title 21 U.S.C. § 843, and that there is probable cause to believe that the installation of a tracking device in the SUBJECT PACKAGE and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

2. I am employed by the Dayton Police Department and have been so since July of 2008. I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau -

Montgomery County Regional Agencies Narcotics and Gun Enforcement (RANGE) Task Force. I have extensive prior experience in investigating drug cases that resulted in successful prosecution of persons involved in trafficking of drugs, possession of drugs and other related offenses. I have been involved in narcotics related arrests, executed search warrants that resulted in the seizure of narcotics and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities, as well as the locations at which they reside and where they store controlled substances and the illegal proceeds derived there from. Through training and experience, I am familiar with the practices of narcotics distributors and sellers, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering. I have been a Task Force Officer with the United States Postal Inspection Service since November 2022. I am presently assigned to the Cincinnati Field Office of the United States Postal Inspection Service, Pittsburgh Division, with investigative responsibility for Southern District of Ohio. Part of my responsibility involves investigating the illicit use of the United States Mails in the transportation of narcotics, other dangerous controlled substances, and financial proceeds from, or instrumentalities used in, the sale of such narcotics and controlled substances (hereinafter, "Drugs and/or Proceeds").

3. Based on my training and experience, I have become aware that drug traffickers frequently use Priority Mail Express, a business-oriented overnight service offered by the United States Postal Service, to transport narcotics and other dangerous controlled substances, and their proceeds or instrumentalities from the sale of the controlled substances. Based on my training and experience, I also know that drug traffickers frequently use Priority Mail with delivery

confirmation, a two-three day service offered by the United States Postal Service. As a result of investigations and successful controlled substance prosecutions where the U.S. Mail was used, I have learned of certain characteristics indicative of other U.S Mail items previously identified as containing narcotics or other dangerous controlled substances, their proceeds or instrumentalities from the sale of the controlled substances. Some of these characteristics include, but are not necessarily limited to or used on every occasion, the mailer using different post offices on the same day to send parcels, false or non-existent return address, the addressee is not known to receive mail at the listed delivery address, the parcel is heavily taped, the parcel is mailed from a known drug source location, labeling information contains misspellings, the label contains an illegible waiver signature, unusual odors emanating from the parcel, and the listed address is located in an area of known or suspected drug activity.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

A. **USPIS intercepted a package containing approximately four ounces of a white pressed powder material that field-tested positive for Cocaine, a Schedule II controlled substance. The package additionally contained approximately three ounces of blue pills with M30 pressed on the pills and one pound, nine ounces on multicolored tablets, both believed to contain fentanyl.**

5. On October 27, 2023, the U.S. Postal Inspection Service intercepted the SUBJECT PACKAGE at the Cincinnati Network Distribution Center in Cincinnati, OH. The SUBJECT PACKAGE is a brown box bearing USPS Priority Mail tracking number 9505 5100 5288 3298 8004 59 mailed from Post Office 89106, located in the Las Vegas, Nevada, postmarked October 25, 2023. I know, based on my training and experience, that Las Vegas, Nevada is a known source location

3

for narcotics. The recipient's information listed on the SUBJECT PACKAGE is "Chris Jerkins, 300 Calumet Lane, Dayton, Ohio 45417." The sender's information listed on the SUBJECT PACKAGE is "Greg Jerkins, 463 Duchess Ave, Las Vegas, NV 89030."

6. I performed a check in CLEAR for the recipient's information listed on the SUBJECT PACKAGE. CLEAR is a law enforcement database that is used as a tool for investigators to identify person/business and address information. According to CLEAR, there is no "Chris Jerkins" associated with 300 Calumet Lane, Dayton, OH 45417.

7. I also performed a check in CLEAR for the sender's information listed on the SUBJECT PACKAGE. According to CLEAR, there is no "Greg Jerkins" associated with 463 Duchess Ave., Las Vegas, NV 89030.

8. A certified drug detection canine officer performed an open-air sniff on the SUBJECT PACKAGE and alerted to the presence of an odor of controlled substances emanating from the SUBJECT PACKAGE.

9. As a result of my investigation, on October 27, 2023, I obtained and executed a federal search warrant (3:23mj458) on the SUBJECT PACKAGE. Upon opening the SUBJECT PACKAGE, I discovered that it contained Ninja Blender box, that was wrapped in plastic wrap. The Ninja Blender box did not contain the blender; however, a large plastic wrapped bundle was inside it. The bundle contained multiple layers of plastic wrap and vacuum sealed bags. The bundle contained four separate bags inside it. A bag weighing approximately four ounces or 113 grams, contained a white pressed powder. Another bag contained approximately three ounces or 85 grams of blue pills with M30 pressed on them. The last two bags contained a combined weight of one pound, nine ounces of 708 grams of multicolored tablets.

10. The white powder was field-tested using a TRUNARC narcotics analyzer. The TRUNARC narcotics analyzer alerted positively to the presence of cocaine, a Schedule II controlled

substance. Based on my training and experience, the pressed white powder is consistent in appearance with cocaine. I will send the substance to a laboratory for forensic testing to confirm my belief that the pressed white powder is in fact cocaine. The blue pills with M30 and the multicolored tablets are suspected to be pressed fentanyl. They will also be sent to laboratory for forensic testing to confirm the belief that they contain fentanyl.

### B. I believe that tracking the SUBJECT PACKAGE will yield evidence relevant to my investigation.

11. For all the foregoing reasons, I believe that unknown individual(s) sent the SUBJECT PACKAGE containing drugs from Las Vegas, Nevada to unknown recipient(s) in Dayton, Ohio, for the purpose of trafficking drugs. As I describe in further detail below, I believe that tracking the location of the SUBJECT PACKAGE will lead to additional evidence of the drug trafficking organization (DTO) including, but not limited to, the identities and locations of coconspirators; locations of stash houses used to store drugs, drug proceeds, firearms, and other drug trafficking paraphernalia; and patterns of activity and methods of operation of the DTO.

12. If this warrant is approved, law enforcement investigators will place a tracking device inside the SUBJECT PACKAGE as well as sham narcotics. The tracking device will enable investigators to monitor the movement and physical location of the SUBJECT PACKAGE wherever it may be taken in furtherance of the DTO, both within and outside the Southern District of Ohio.

13. Based on my observation and the observations of fellow law enforcement officers, I know that the SUBJECT PACKAGE is presently within the Southern District of Ohio.

14. In order to track the movement of the SUBJECT PACKAGE effectively and to decrease the chance of detection, I seek authorization to place a tracking device in the SUBJECT PACKAGE while it is in the Southern District of Ohio.

5

15. I believe that the tracking of the SUBJECT PACKAGE will allow law enforcement to gather information regarding the locations of narcotics, proceeds of narcotics, and drug trafficking activity. In particular, law enforcement intends to attempt a controlled delivery of the SUBJECT PACKAGE containing the sham narcotics in an effort to identify individuals who are involved in the DTO. Additionally, as I know that individuals often take to stash houses packages containing controlled substances, installation of a tracking device in the SUBJECT PACKAGE may assist law enforcement to identify locations at which drug traffickers are keeping, storing, and/or selling controlled substances.

16. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private residences or other such locations not open to the public or visual surveillance.

17. Within 10 days of the issuance of this warrant, investigators will use an undercover officer dressed as a United States Postal Letter Carrier to deliver the SUBJECT PACKAGE to the addressee listed in the Southern District of Ohio. The tracking device will be installed inside the SUBJECT PACKAGE in the Southern District of Ohio, and will provide GPS data as to the location of the SUBJECT PACKAGE, as well as alert investigators when the SUBJECT PACKAGE is opened (via a light detection device). I believe, based upon my training and experience and my knowledge of this case, that unidentified individual(s) will receive and transport the SUBJECT PACKAGE in furtherance of their drug trafficking activity.

**BACKGROUND ON DRUG TRAFFICKERS**

18. I believe that tracking the location of the SUBJECT PACKAGE will provide information regarding the DTO, such as the identities of those involved in the drug trafficking conspiracy; locations where drugs, drug proceeds, firearms, and other drug trafficking paraphernalia are

6

stored; and the methods of operation of the DTO. Based on my training and experience, I believe that evidence derived from tracking the SUBJECT PACKAGE will yield additional evidence about the following common practices of drug traffickers:

i. Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii. Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii. Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv. Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v. Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different

7

techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi. Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii. Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to

8

        process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

ix. Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x. Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi. Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii. Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiii. During the course of a search it is not uncommon to find items of personal

9

    property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

 xiv. Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles; and

 xv. I know that drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities. I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following. This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

## AUTHORIZATION REQUEST

19. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the USPIS or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in the SUBJECT PACKAGE within the Southern District of Ohio within 10 days of the issuance of the proposed warrant, and to maintain, repair, and/or replace the tracking device as necessary; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private residences and other locations not open to the public or visual surveillance, both within and outside the Southern District of Ohio.

20. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I

further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

21. I further request that the Court seal the warrant and the affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the USPIS, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

*Sean C. Humphrey*
_____
Sean C. Humphrey
Task Force Officer
United States Postal Inspection Service

Subscribed and sworn to before me on October 30, 2023.

_____
Peter B. Silvain, Jr.
United States Magistrate Judge

11